## J. HOWARD ARDREY ET AL. v. J. P. ZANG.

Decided April 9, 1910.

**Injunction—Disbursement of School Funds.**

A city charter vested in the City Commissioners the exclusive power to determine the advisability of the issuance of bonds by the city, including bonds for school purposes and the submission of such proposition to the voters of the city at an election to be held for that purpose; the Board of Education of said city was vested with the management, control and disbursement of the school funds, but it had no power to initiate or submit to the people the question of the issuance of bonds for school or any other purpose; in applying to the City Commissioners to order an election for the issuance of bonds for school purposes and in urging the people to vote for the same, the Board of Education specified particularly the purposes for which the money was needed and to which it would be applied; the City Commissioners ordered the election, stating therein the proposition to be whether or not bonds should issue "for the purchase of grounds and the construction and erection of grade school buildings therein for the city;" the proposition was stated in the same way in the ballots used at the election; neither the order nor the ballots specified for what particular purposes the money would be expended; after the bonds were issued and sold the Board of Education was about to use a part of the money for a purpose other than any of those specified before the election, but still for the benefit of the public schools. Held, there being no allegation or evidence of fraud, the Board was not confined in the use of the money to the particular purposes named by them before the election, but could expend it for the best interests of the' schools, limited only by the terms of the proposition submitted to the voters, and an injunction would not lie to restrain them from so doing.

Appeal from the District Court of Dallas County, Texas. Tried below before Hon. J. C. Roberts.

*Jas. J. Collins* and *John C. Robertson,* for appellants.—Where an election has been duly ordered for the purpose of determining upon the issuance of bonds, and the proposition of the issuance of said bonds is plainly and clearly expressed, each voter is presumed to know the full meaning and effect of the proposition submitted to him, and it is not admissible to permit an inquiry into the motives actuating said voter participating in said election. City of Austin v. Nalle, 85 Texas, 544 et seq.; 1 Cooley on Taxation, 581, 3d ed., also page 569; Skinner v. Santa Rosa, 107 Cal., 464; Town of Big Grove v. Wells, 65 Ill., 263; Hodgman v. Chicago & St. P. R. Co., 20 Minn., 48.

Where an election has been duly ordered and held for the purpose of determining upon the proposition of issuing bonds, and a plain and clear proposition is submitted, the purpose for which said election has been held can not be altered, amended or changed on account of any representations made to the voter, though such representations may be of a fraudulent nature. Same authorities.

The discretion and motives of a municipal body can not be inquired into or interfered with by a court of equity. East St. Louis v. Zebley, 110 U. S., 321-325; 2 High on Injunctions, 1244, sec. 1240; article 5, City Charter, Special Acts 1907; Waterbury v. Laredo, 60 Texas, 523; subdivision 5, article 2, City Charter, Special Acts 1907.

A taxpayer can not maintain a suit in equity seeking to enjoin a municipal corporation, unless he shows clearly that he suffers injuries peculiar to himself. McDonald v. Lyon, 43 Texas Civ. App., 484.

A court of equity will not interfere with matters which are in their nature political. Same authorities.

Where the charter prescribes that bonds must be submitted to an election before their issuance, and that said election must be duly ordered, pursuant to an ordinance, it is necessary to the validity of said bonds and election that the election be ordered by ordinance. 21 Am. & Eng. Ency. Law, p. 45; 28 Cyc., 1591; National Bank of Commerce v. Town of Grenada, 54 Fed., 100, affirming National Bank of Commerce v. Town of Grenada, 44 Fed., 262.

RAINEY, Chief Justice.—This is an injunction suit brought by J. F. Zang, appellee, a taxpayer of the city of Dallas, against appellants, who compose the board of education of the city of Dallas, and certain city officers, to restrain the alleged diversion of certain funds arising from the sale of certain bonds issued by said city for school purposes. Appellants filed general and special demurrers, and a general denial. The court overruled the demurrers and, after hearing the evidence, rendered judgment for appellee.

The findings of facts of the trial court are as follows:

"1.  I find that J. F. Zang is a taxpayer of the city of Dallas.

"2.  That the respondents are the specific officers mentioned in

the bill, and that A. S. Jackson is the president of the board of education.

"3.   That a necessity exists for the erection of what is known as the North Oak Cliff School, there being one hundred and eighty-six children contiguous thereto, and that the school adopted by the board of education was a four-room building, in each of which rooms forty children can be accommodated.

"4.   That the board of education of the city of Dallas, by written resolution adopted and as a part of the recorded minutes of that board, determined on February 15 that a two hundred thousand dollar bond issue was necessary for the following purposes:

"An eight-room building in Oak Lawn, estimated cost......$32,000
"A four-room building and site for same in Oak Cliff, estimated cost ........................................ 25,000
"A four-room addition to Fannin School, estimated cost.... 15,000
"A four-room addition to Colonial Hill School, estimated cost. 15,000
"A four-room addition to Reagan School, estimated cost..... 15,000
"A four-room addition to David Crockett School, estimated cost . . . ........................................ 15,000
"A four-room addition to Bowie School, estimated cost...... 15,000
"A building site in South Dallas, estimated cost............ 7,500
"A building site in East Dallas, estimated cost............. 7,500
"A building site in Northeast Dallas, estimated cost......... 7,500
"For balance due on Fair Park School, and for repairs on existing buildings, particularly San Jacinto and Cedar Lawn buildings, estimated cost........................ 28,000
"For additions and repairs to negro schools, estimated cost.. 20,000

"Total estimated cost of above................$200,000

and, further, in that resolution said that it was imperative that the above buildings and additions be erected and said repairs made before the opening of schools in September, 1909.

"5.   That that resolution and report was submitted to the board of commissioners of the city of Dallas by A. S. Jackson, president of the board of education, as shown by a written memorandum which has been filed as a part of the records of the city of Dallas, in which record it was stated to the board of commissioners that two hundred thousand dollars was necessary for certain permanent public improvements, and referred to the copy of the resolution above detailed in this finding.

"6.   That the board of commissioners of the city of Dallas referred each of said written records and memorandums to C. B. Gillespie, commissioner of finance and revenue for the city of Dallas, who reported thereon in a written report in the following words and figures:
" 'Hon. Board of Commissioners:

" 'Gentlemen:   Reporting upon the petition of the board of education for the submission to the qualified voters of the city of Dallas of the proposition for the issuance of bonds to the amount of two hundred thousand dollars for certain permanent public improvements

in connection with the public free school system of this city, I beg
to say that I have given the matter a careful investigation, and rec-
ommend that the proposition to issue bonds for school purposes in
said sum of two hundred thousand dollars be submitted to the
qualified voters of this city, at the election to be held on the 6th
day of April, 1909.

"'Respectfully,
"'(Signed) C. B. Gillespie,
"'Com'r of Finance and Revenue.'

"'7. That these written memorandums and records are officially
filed and a part of the records of the city of Dallas.

"8. That thereafter the mayor of the city of Dallas, in pursuance
of an ordinance passed by the board of commissioners as shown by
the record, ordered the election on the first Tuesday in April, among
other things, 'to determine the issuance of two hundred thousand dol-
lars in bonds, for the said city of Dallas, for the purpose of obtaining
money for the purchase of grounds and the construction and erection
of grade school buildings thereon for the city of Dallas.'

"9. That thereafter, and prior to the election, the board of educa-
tion, over the signature of its respective members and officially, placed
in the hands of the voters of Dallas, by and through the school chil-
dren, twelve thousand circulars, which contained the following:

"'Strict economy in our plans for building and furnishing will be
required to make the $200,000 asked for meet the necessities of the
situation, which include: An eight-room building in Oak Lawn; a
four-room building and site in Oak Cliff; a four-room addition to
Fannin School; a four-room addition to Colonial Hill School; a
four-room addition to Crockett School, or building on site to be pur-
chased in East Dallas; a four-room addition to Reagan School; a
four-room addition to Bowie School; a site in South Dallas; a site
in East Dallas; a site in Northeast Dallas; critically needed remod-
eling and repairs of some existing buildings; additions and repairs
to five of the negro schools. The soundness of the policy of securing
the building sites mentioned before prices are further advanced, needs
no comment.'

"10. That the bonds were voted by the people in April, 1909, and
the city of Dallas realized therefrom over one hundred and ninety
thousand dollars.

"11. That the board of education has erected all of the improve-
ments mentioned in said records and resolutions and said circular,
except the Oak Cliff School, and certain improvements for the negroes.

"12. That the board of education has selected and purchased the
site for the four-room building in Oak Cliff, and selected and pur-
chased and approved plans for the building thereon.

"13. That the board of education intends to expend three thou-
sand dollars outside of said record and resolution and circulars here-
inbefore mentioned, and that the said expenditure has been approved
by the board of commissioners of the city of Dallas, and that said
expenditure will so reduce the balance of said bond money that the

board will be unable to build the house in Oak Cliff, as specified in said resolution.

"14. That the city charter provides that 'Any proposition to issue new or additional bonds, as authorized herein, as well as the amounts of such issuance and the purposes of the same, shall be first submitted to a vote of the qualified voters of the city, who are taxpayers in said city, at an election to be held for that purpose.'

"15. That the city charter of the city of Dallas provides that the board of education shall have full power over the expenditure of all moneys for the benefit of the schools of the city of Dallas, subject to a veto power by the board of commissioners when a purchase exceeds in value the sum of one thousand dollars."

The board of commissioners of the city of Dallas passed an ordinance ordering a special election to be held that the taxpayers of Dallas might vote to determine whether or not certain propositions might be inaugurated, among them was the issuance of bonds for the enlargement of school facilities which was as follows:

"That at said election there shall be submitted to the qualified voters of the city of Dallas, who are taxpayers on property in the city of Dallas, the proposition of the issuance of two hundred thousand dollars in bonds of the city of Dallas, for the purpose of obtaining money for the following permanent public improvements, viz.: For the purchase of grounds and the construction and erection of grade school buildings thereon for the city of Dallas, Texas.

"Section 3. That the vote at the special bond election herein ordered shall be upon an official ballot, submitting the said respective propositions of the issuance of said respective bonds and the respective amounts thereof, and the same shall be expressed upon the ballot as follows, to wit:

" 'For the issuance of two hundred thousand dollars in bonds of the city of Dallas, Texas, for the purpose of obtaining money for the following permanent public improvements, viz.: For the purchase of grounds, and the construction and erection of grade school buildings thereon for the city of Dallas, Texas.'

" 'Against the issuance of two hundred thousand dollars in bonds of the city of Dallas, Texas, for the purpose of obtaining money for the following permanent public improvements, viz.: For the purchase of grounds, and the construction and erection of grade school buildings thereon for the city of Dallas, Texas.' "

This was the only question submitted to the people with reference to schools for their decision, and the only representation as to use and purpose of the proceeds of said bonds made by the commissioners was expressed in said ordinance.

The board of commissioners alone has the power under the city charter to determine the advisability of the issuance of bonds and then only after the proposition has been sanctioned by a vote of the citizens at an election held for that purpose, as was done in this case. The city charter gives to the board of education the management and control of the schools and the disbursement of the school fund, subject to the veto of the board of commissioners when in the purchase or sale of property the amount exceeds or equals one thou-

sand dollars. It has no controlling power to initiate or submit to the people the question of raising money or the issuance of bonds for any purpose. Having no powers in regard to the raising of money, what effect did its representation to the board of commissioners relative to the issuance of bonds or the representations made to the voters after the election was ordered held and before the holding thereof, have in controlling their action in disbursing the fund? We think none. The representations were not embodied in the proposition submitted by the commissioners to the people to vote upon. The commissioners were not bound to submit the exact proposition of the board of education, but they had the right to submit such a proposition as they deemed best, and they did submit to the people the proposition whether or not bonds should issue "for the purchase of grounds, and the construction and erection of grade school buildings thereon for the city of Dallas." This proposition did not *specify any particular* piece of ground to be purchased, nor any particular part of the city where it was to be located. The proposition of the commissioners was plain and unambiguous and from it the voters had a right to expect that the money arising from the bonds would be used in the purchase of grounds for the erection, etc., for school buildings, but as to any particular site being purchased in any particular location they could only trust to the discretion of the board of education for the selection of any such site. So long as the board of education was acting within the terms of the proposition submitted by the commissioners and balloted on by the people, that is, was using the funds derived from the sale of the bonds for purchasing sites and erecting buildings thereon, it was acting within the scope of the power conferred on it by the city charter, and there was no legal diversion of the funds, and the courts should not interfere by enjoining the acts of the board in exercising its discretion in complying with the proposition submitted to the voters.

The case of City of Austin v. Nalle, 85 Texas, 520, was an action by Nalle to annul certain bonds issued by the city of Austin and to restrain the collection of the tax for the payment thereof. In the ordinance passed for the issuance of said bonds and providing for the levy of a tax, one of its provisions was that said bonds should not be sold for less than par. After the election the city council repealed this provision, and the bonds were placed upon the market at ninety-five cents on the dollar and sold at that price. It was alleged, in substance, that the vote in favor of the bonds was induced mainly by representations made to the voters that none of the bonds should be sold below par, and this was urged as one ground for the injunction. In passing on this contention Mr. Justice Gaines, delivering the opinion, said: "It is now insisted that by reason of these facts it was illegal to repeal the provision and to sell the bonds at less than their face value. The proposition submitted at the election contained no condition limiting the price at which the bonds should be disposed of; and the citizens who voted at the election must be held to have known that the ordinance which had been passed limiting the price was subject to repeal by the council which passed it, or by any future council. Conceding, for the sake of the argument, that

we could inquire into an election held strictly according to the terms of law, we are of opinion that we could not set it aside by reason of any fraudulent representations that may have been made to the electors in order to procure their votes. Having a plain proposition submitted to them, the voters must be presumed to know its meaning and effect, and to act at their peril; and in the absence of bribery or other like corrupt influence, in a proceeding affecting the validity of the election no inquiry as to their motives can be permitted."

In the representations made by the board of education there is nothing to show it was acting fraudulently; no bribery or other like influence is disclosed, and the alleged diversion of part of the fund does not show such a palpable abuse of discretion as will justify the court in restraining the action of the said board.

We are of the opinion that the injunction was wrongfully granted, and is therefore dissolved.

The judgment is reversed and the injunction and suit dismissed.
*Reversed and dismissed.*

Writ of error refused.